# CHARLESTON.

## ARBOGAST v. MYLIUS.

Submitted January 26, 1904.   Decided February 23, 1904.

1.  REAL PROPERTY—*Sale.*

    M. on behalf of himself and P., joint owners of a tract of land, by contract under seal—but which contract was not authorized by P.—sold the same to A. receiving from A. on account of the cash payment $250, and $50, and A. also paid out for surveying the land for M. $255; afterwards at the suggestion and request of M. the contract was mutually, orally, rescinded, M. agreeing to repay to A. the said three sums so paid by A., with interest, M. acting upon such oral rescission resold the land to other parties. *Held*, That A. could recover in *assumpsit* from M. the money so paid by him.   (p. 107).

2.  CONTRACT.

    While the general rule is that a contract must be discharged in the same form as that in which it was made, yet the rule does not apply where a parol contract rescinding or modifying a contract under seal has been acted upon, so that it would be inequitable to hold the parties to their original contract.   (p. 107).

Error to Circuit Court, Randolph County.

Action by John C. Arbogast against Charles E. Mylius. Judgment for plaintiff, and defendant brings error.

*Affirmed.*

W. B. Maxwell and Strader & Strader, for plaintiff in error.

J. L. Wamsley, for defendant in error.

McWhorter, Judge:

This is an action of *assumpsit* brought by John C. Arbogast against Charles E. Mylius, in the circuit court of Randolph County, averring that defendant was indebted to plaintiff in the sum of $1,000 for money before that time paid and expended by the plaintiff for the use of defendant at his request; and in the like sum for money found to be due from the defendant to the plaintiff on account then and there stated between them. With his declaration plaintiff filed an account against the defendant consisting of three items:

Cash...................................................$250.00
Amount advanced by B. L. Butcher...................... 50.00
Amount paid for surveying............................. 265.00

Total..................................................$565.00

The defendant entered a plea of *non-assumpsit* and filed a special plea in writing to which the plaintiff replied generally. The special plea being to the effect that plaintiff ought not to recover in the action because he says that the several supposed promises and undertakings in the declaration mentioned, if any such were made, were each of them made by the defendant jointly with one James Pickens who was still living, and not by plaintiff alone; that James Pickens was not named in the writ and declaration. By agreement and consent of the parties both issues presented by the pleadings were tried at the same time by the same jury, and any proper evidence offered upon either issue was to be heard by the jury. A jury was empaneled and the case tried on the 27th of January, 1903. After the plaintiff had introduced all his evidence the defendant demurred to the plaintiff's evidence in which the plaintiff joined. The jury

found for the plaintiff a conditional judgment for $844.60, which is conceded to be the amount of the three items with interest, and the correct amount of judgment in case the court did not err in overruling the demurrer. The court overruled the demurrer and entered up judgment for said amount, with costs. The defendant obtained from one of the judges of this Court a writ of error and *supersedeas,* and for error says the evidence shows that James Pickens was a joint and equal owner with defendant in the contract of June 19, 1903, whereby a tract of land was sold by defendant and Pickens to plaintiff, and if plaintiff had any right to recover it was against both, and Pickens not having been a party defendant the case should have been abated upon the issue taken upon the plea of non-joinder; that the evidence shows that plaintiff still holds the contract of June 19, 1903; that he produced it on the trial and had never surrendered it, and it was such a contract as could be specifically enforced by complying with the terms thereof; that none of the evidence offered by the plaintiff was germane under either of the counts in the declaration and that in no event should defendant be charged with the expense of B. M. Yeager in making the survey because under the contract plaintiff was to pay that, and that certainly defendant should not be charged with Pickens' one-half of the expense of the surveyor, Mollohan, because they are jointly liable to pay their said part of the expense. The contract under which defendant claims, Pickens is jointly liable with himself, is a written contract made June 19, 1903, between James Pickens, and C. E. Mylius of the one part and John C. Arbogast of the other part, which is a contract of sale of a tract of about two thousand acres of land at $6.00 per acre, by Pickens and Mylius, in consideration of $250.00 paid to, and the receipt acknowledged by Mylius, one-third of the purchase money less said $250.00 cash payment to be paid when the deed, provided for in the contract was made and delivered, one-third in one and the other one-third in two years from the delivery of the deed, then follows a general description of the land: "Said land to be surveyed, surface measure, by B. M. Yeager and Bernard L. Mollohan, the former to be paid by said Arbogast and the latter by said parties of the first part. Surveying to be done as soon as practicable and deed of general warranty made in accordance therewith;" the deferred payments to draw interest

and notes to be executed when deed was delivered and vendor's lien to be retained for the payment thereof. The contract was signd by Charles E. Mylius and "James Pickens, per C. E. Mylius" and J. C. Arbogast, by E. Hutton. The defendant took the deposition of Pickens in which he repudiates this contract. He says in his testimony: "As far as the contract is concerned, I never saw the contract and knowed nothing about there being a contract in writing." · States that sometime in the latter part of the summer or fall of 1893, Elihu Hutton came to witness's house and Hutton proposed to buy his one-half interest in the lands which he supposed were the same mentioned in the contract. Hutton wanted him to go into a written contract, that his partner had accepted witness's terms but witness refused to go into a contract of any kind, in writing, "but told him if they would pay the money and sign the notes for the unpaid purchase money or deferred payments, payable in gold or its equivalent, that he would deed them the land." B. L. Butcher, a witness for plaintiff, says that he and Arbogast were at the court in the fall of 1897, waiting for this case to be reached on the docket; that they were impatient to get away and went to Mylius in the old court house with a view of settling the case and after talking the matter over he agreed to all the statements witness made to him; he agreed that he was to return the money that Mr. Arbogast had advanced him; witness said to him "What is the use to law about a case we have agreed upon? He said John had sued him and he didn't know whether he would ever pay him or not." Butcher was asked: "What money was mentioned that was to be refunded to Mr. Arbogast at the May term of this court, in May 1894, under the agreement in which the contract was to be rescinded?" A. "I don't know. There was only three items. The $250.00, cash at the time, and the $50.00. I was present when the two payments had been made and we both knew of the surveying expenses. I am sure Mr. Mylius knew and perhaps told me;" that Mylius agreed to refund the three items, the $250.00, the $50.00 and the surveying amount. "Mr. Mylius intended to have the land surveyed before that whether we took it or not;" that he wanted to pay the money back to avoid litigation and get back the title to his property. "I think at the time we had the conversation with him the contract was misplaced. No one seemed to know

where it was. We thought Major Harding had it; it was mislaid for sometime." When asked "Did Mr. Pickens ever approve this contract?" A. "I think he refused this contract and refused to sign it;" that Mr. Pickens disapproved the contract. Colonel Elihu Hutton, a witness for plaintiff, says he signed the contract for Mr. Arbogast, and Mr. Mylius signed it for himself and Mr. Pickens; that in 1894 Mr. Mylius, Mr. Butcher and witness went over this business and Mr. Mylius said he was willing to refund their money if they would give him back his property. Q. "Do you know whether they arrived at an agreement at that time?" A. "They did as between Mr. Butcher, myself and Mr. Mylius." Q. "State whether you had any communication from Mr. Pickens or any conversation in relation to this contract to which Mr. Mylius had signed Mr. Picken's name?" A. "I did. I saw Mr. Mylius and Mr. Pickens, and Mr. Pickens said he wouldn't sign the contract, but he would comply with the conditions of it if he was paid up in gold he would make a deed for it." He said Pickens didn't repudiate the contract but he would not sign it. On cross examination witness stated that he and Mylius had gone to see Pickens immediately after the preparation of the contract; that they wanted his sanction in the matter; they showed him the contract and he said if it was complied with it would be satisfactory with him, except the gold part; he wanted it to be paid in gold. Major Harding testified that he wrote the contract; that after it was written some of the parties took it away. Later some of them claimed that he had it, but he had made a search of his papers and it was not there and he did not recollect when he next saw it. It could not be found when this suit was brought; was not present when the rescinding of the contract was had in May, 1894. B. M. Yeager testified that he aided Mr. B. Mollohan in the surveying under the contract in the fall of 1893; that they received payment for their work from Mr. Arbogast, he thought, about $250.00; that his receipt was in the papers. The receipt filed in the case signed by B. Mollohan and B. M. Yeager is for $255.66. He said on one or two occasions Mr. Mylius had asked him if he could not go and survey the land; "he said Mr. Pickens had been making a great many sales and he did not know what land he had left;" that was before they did the work, he thought in the spring of 1893.

On cross examination witness says he never promised to go until he got a letter from Mr. Arbogast; that he had bought the land and that it was at his request that he did the work. Plaintiff Arbogast, testified that in May, 1894, Mr. Mylius met him in Weston; they went to Buckhannon together and had a conversation; Mylius "said he had been over to Beverly and had arranged with Butcher to pay back all the money paid out on this contract if we would release him, and I told him if it was satisfactory with Butcher it would be all right with me." Witness says in October, 1897, at the old court house at Beverly Mr. Butcher and he had a conservation with Mylius and made an attempt to get the matter settled without going any further with the suit; they talked the matter over and they asked Mylius if he didn't agree to pay back the money they had advanced "and he said he had agreed to do these things and he said I had brought the suit and if he could get out of paying it he would;" that "he admitted he was to pay back all the money we had paid out on the land, the $250.00, the $50.00, and the $255.66; these items were all named by me on the train at Buckhannon and he agreed to pay all back." Witness stated that as to delivering the contract to Mr. Mylius, he never saw the contract, but no one seemed to know where it was. At the time the arrangement was made, it was thought that Colonel Hutton had it; and then they thought Major Harding had it; and finally they came to the conclusion that Mr. Mylius had it; that he didn't know where the contract was found; that Mr. Mylius told him on the train that he had a chance to sell the land for more money and if they held him to the contract he would have to bring suit, and that if they would release him from the contract he would pay back all the money. Witness stated that he had complied with the contract as far as he knew how, in releasing Mylius; that no writing of release had ever been asked for, but that he had always been ready and willing, and was yet, to make such writing; there was never anything said about a writing of any kind to release him. Plaintiff testifies that in the conversation on the train going to Buckhannon that he had surrendered all his rights and never considered that he had any rights there afterwards and that Mylius should take the land and do as he pleased with it under the consideration that he pay back this

money, and that Mylius had told him afterwards, in 1897, or 1898, that he had made sale of the land for $10.00 per acre.

The dealings seem to have been between Arbogast and Mylius and from the evidence introduced by Mylius himself, James Pickens, the only witness introduced by the defendant, says he never executed the contract, and it is not shown that he authorized defendant to sign his name to it and the defendant does not go upon the witness stand to testify that he was authorized to make the contract. It is clearly shown that the defendant agreed to pay back all the money that had been paid, the three items mentioned in the account, in consideration of his release from said contract. He was so released orally, by Arbogast and the defendant acted upon such release and resold the land at a very much higher price as stated by himself to Arbogast, than it was sold under the contract so released. While "the general rule is that a contract must be discharged in the same form as that in which it was made," yet there are exceptions to said rule. "By the weight of authority, in this country, at least the rule does not apply where a parol contract rescinding or modifying a contract under seal has been acted upon so that it would be inequitable to hold the parties to their original contract." Clark on Contracts, 617. It is claimed by plaintiff in error that the contract in case at bar not being surrendered could be by Arbogast, specifically enforced. The contract having been rescinded by mutual consent and Mylius having in good faith acted under that rescission by a resale of the property Arbogast would be estopped from the specific enforcement of it. The real rescission of the contract was made at the suggestion and request of defendant Mylius and he did not ask for a writing releasing him, but accepted the oral release and acted upon it, and the plaintiff having in good faith released the defendant, the defendant by reason of his promise and agreement became personally liable for the repayment of the money advanced to Mylius, and paid out on account of the surveying. Plaintiff in error says he should not in any event be required to pay Pickens' part of the cost of surveying, yet in securing the release he was acting for himself and the release by Arbogast was a good consideration for his promise and agreement to pay back all the money paid by Arbogast who had no further interest in the land, and derived no benefit from the survey made of the same.

The plaintiff having done everything that was required of him by the defendant to release him from his contract and expressed himself ready and willing to do anything further that might be necessary showed himself entitled to recover in this case on the common counts in *assumpsit* and the court did not err in overruling the demurrer to the evidence, and the judgment is affirmed.

*Affirmed.*